## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 08 2018, 8:53 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Julianne L. Fox
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: Termination of the Parent-Child Relationship of:

B.C. (Minor Child),

And

C.C. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 8, 2018

Court of Appeals Case No.
82A04-1710-JT-2431

Appeal from the Vanderburgh Superior Court

The Honorable P. J. Pierson, Special Judge

Trial Court Cause No.
82D04-1704-JT-748

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, C.C. (Mother), appeals the trial court's termination of her parental rights to her minor child, B.C. (Child).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of her parental rights.

## FACTS AND PROCEDURAL HISTORY[1]

Mother is the biological parent of the Child, born on November 25, 2012. T.E. is the Child's alleged father.[2] On September 27, 2015, the Vanderburgh County office of DCS received a report alleging that the two-year-old Child was a victim of abuse or neglect. Specifically, Mother, while at Wal-Mart with the Child, had been discovered shoplifting and was arrested. With no one available to care for the Child, DCS met Mother at Wal-Mart and took the Child into

---

[1] Although the trial court took judicial notice of the file in this case, *none* of the filings have been submitted to our court. This seems to be an increasing occurrence, and it is incredibly frustrating to our review. Nevertheless, in this instance, we are able to resolve the arguments raised by Mother based on the record before us.

[2] The alleged father had no involvement throughout the case and is not a participant in this appeal.

custody. During DCS's assessment of Mother, she admitted to using "[p]ills"—*i.e.*, Klonopin and Lortab. (Tr. Vol. II, p. 13).

[5]     On September 29, 2015, DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS). On October 7, 2015, Mother stipulated to the facts alleged in the CHINS petition, and the trial court adjudicated the Child to be a CHINS. On November 4, 2015, the trial court held a dispositional hearing and ordered Mother to participate in various services, including a substance abuse evaluation and treatment, as well as drug screens. The trial court also directed Mother to remain free of drugs and alcohol and to engage in visits with the Child. It appears that the formal dispositional order was issued on January 22, 2016.

[6]     Mother's subsequent engagement in reunification services was poor. Although she refused to participate in DCS's drug screens, she failed two drug screens for the probation department in her criminal case (at least one of which was for methamphetamine)—one in April of 2016 and the other in May of 2016. Mother admitted that she was using drugs on a daily basis. For the probation violations, Mother was incarcerated for thirty days and ninety days, respectively. At some point, DCS discussed in-patient substance abuse treatment with Mother, but Mother refused, indicating that "jail is what would help." (Tr. Vol. II, p. 136). When Mother was not incarcerated, she participated in supervised visits with the Child.

[7]    In August of 2016, due to the stagnancy of the case, the permanency plan was changed from reunification to adoption. Nevertheless, DCS continued to offer services to Mother. Around that time, the reality of losing her Child set in, and Mother indicated that she became motivated to participate. On September 14, 2016, Mother appeared for her first DCS drug screen. While Mother did not have controlled substances in her system at that time, she tested positive for alcohol use. Between September of 2016 and May of 2017, Mother appeared for thirteen additional drug screens, none of which were positive for controlled substances. However, five of those drug screens were diluted, which is generally viewed as an attempt to conceal drug usage. Furthermore, Mother was required to regularly call in order to determine whether she was scheduled for a random drug screen, and by her own estimate, Mother should have submitted to "seventy[ or] eighty" drug screens throughout the case. (Tr. Vol. II, p. 25). In November of 2016, Mother attended an appointment for a substance abuse evaluation, but she missed her follow-up appointment and never re-scheduled.

[8]    Despite Mother's non-compliance with drug screens, her interactions with the Child went well. That said, Mother regularly failed to comply with the visitation service provider's rules, and a few safety issues were noted during the visits—such as the Child finding two loose pills (Ibuprofen and Vitamin E) in his bedroom and having access to a BB gun. Mother also exhibited aggressive behavior toward the visitation supervisor. Mother generally maintained some form of employment throughout the case, and DCS did not have concerns

about Mother's ability to provide suitable housing and food for the Child. Thus, in mid-December of 2016, the Child was returned to Mother for a trial home visit. At the beginning of January, Mother and her boyfriend were involved in a domestic dispute in front of the Child, which apparently resulted in the arrest of Mother's boyfriend, although no charges were pursued. Then, at some point during the trial home visit, Mother stopped communicating with DCS, and DCS became concerned that "something was wrong." (Tr. Vol. II, p. 133). On January 20, 2017, the DCS family case manager went to Mother's house and administered a drug screen. While waiting for the results, Mother "was crying" and admitted that she had been drinking water to dilute the test results because she knew it would return positive for methamphetamine and marijuana. (Tr. Vol. II, p. 134). The test was positive for methamphetamine. That day, the Child was removed and returned to foster care.

[9] On February 23, 2017, Mother enrolled herself in in-patient drug treatment at Stepping Stone; however, she was terminated from the program the following month. On April 25, 2017, DCS filed a petition to terminate Mother's parental rights. Even after the petition was filed, DCS continued to provide Mother with visitation services. In May of 2017, Mother began out-patient drug treatment at Counseling for Change. Mother does not have a driver's license, and she relies primarily on public transportation to get to work, counseling, and visits with the Child.

[10] On August 11, 2017, the trial court conducted a hearing on DCS's termination petition. At the hearing, Mother claimed that, with the exception of a positive

screen for marijuana, she had otherwise been sober for seven months and remained in counseling. Mother was also engaging in weekly visits with the Child. Mother argued that if DCS had assisted her with transportation, she would have been able to regularly comply with drug screens and drug counseling during the case. In turn, DCS presented evidence of Mother's non-compliance with her required services, as well as evidence that Mother had never indicated a need for transportation assistance and had actually refused the services of a parent aide. By the time of the termination hearing, the Child had spent nearly half of his life in foster care, and both DCS and the Child's court-appointed special advocate (CASA) recommended termination of Mother's parental rights. On September 18, 2017, the trial court issued an Order on Involuntary Termination of Parental Rights of Mother.

Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Mother challenges the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). In fact, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Nevertheless, parental rights "are not absolute and must be

subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* When "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015).

Indiana courts utilize a "deferential standard of review in cases concerning the termination of parental rights" because of the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. On appeal, our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, giving deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.* Where, as in this case, the trial court enters special findings of fact and conclusions thereon in accordance with Indiana Trial Rule 52(A), we evaluate whether the trial court's decision is clearly erroneous. *Id.* Under this standard, we must determine "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* at 1230.

## II. *Termination of Parental Rights Statute*

In order to terminate a parent's rights to her child, DCS must prove:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
* * * *
(iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.* "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate

for the child's very survival.  Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody."  *K.T.K.*, 989 N.E.2d at 1230.

[15]   In ordering the termination of Mother's parental rights, the trial court concluded that DCS had established each element of Indiana Code section 31-35-2-4(b)(2).  On appeal, Mother does not contest that the Child has been removed from the home for the requisite period of time or that DCS has established a satisfactory plan for the Child's care and treatment.  We address the remaining elements in turn.

### A.  *Remediation of the Conditions Resulting in the Child's Removal*[3]

[16]   In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside the home and subsequently determine whether there is a reasonable probability that those conditions will not be remedied.  *Id.* at 1231. A court "must judge a parent's fitness 'as of the time of the termination proceeding, taking into consideration evidence of changed conditions'— balancing a parent's recent improvements against 'habitual pattern[s] of

---

[3] Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS is required to prove only one of three listed elements.  *See In re A.K.*, 924 N.E.2d at 220-21.  In this case, DCS did not allege that the Child had twice been adjudicated a CHINS; therefore, the two relevant inquiries are whether there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside of the home will not be remedied or whether there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being.  We elect to dispose of this issue by reliance on the former element.

conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS need not "provide evidence ruling out all possibilities of change; rather, it need only establish 'that there is a reasonable probability that the parent's behavior will not change.'" *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*.

[17] In this case, the Child was removed from Mother's care when she was arrested for shoplifting, leaving no other suitable caregiver. The Child then remained a ward of DCS because of Mother's ongoing substance abuse. The trial court determined that

> [o]verall, Mother has failed to remedy the situation that brought about the removal of the [Child]. Based on the pattern of behaviors and continuing pattern of substance abuse by Mother, the [c]ourt finds that there is not a reasonable probability that the situation which brought about the removal of the [C]hild is likely to be remedied. The [c]ourt finds that Mother's past behavior and failure to address the issues are the best predictors of her future behavior.

(Appellant's App. Vol. II, p. 7).

[18] Notwithstanding Mother's "admitted pervasive history of substance abuse," she now claims that as of the termination hearing she

> was doing well in her treatment at Stepping Stone. Mother voluntarily sought out the Stepping Stone treatment program in a desire for long-term sobriety because she loved her son. Mother was employed at the time of trial despite having to quit her job in order to make her scheduled visitation with the [C]hild. Mother's current status at the time of her termination trial was stable and clean. The original conditions of her addictions were in the process of being remedied at the time of termination.

(Appellant's Br. p. 7) (internal citations omitted). Mother further argues that "[n]o evidence was presented that the [C]hild would be harmed or disadvantaged in any way by delaying termination"; thus, she should be permitted to "continue on toward reunification." (Appellant's Br. pp. 7-8).

[19] We find that ample evidence supports the trial court's determination. Mother began taking illegal drugs when she was thirteen years old and has no support system as most of her immediate family members—*i.e.*, her father, sister, and brother—also have long histories of substance abuse. Most of Mother's relationships have been with men involved in substance abuse, including the Child's alleged father. Mother declined to participate in either in-patient or out-patient drug treatment until well after the Child's permanency plan had been changed to adoption. Even then, she was quickly terminated from Stepping Stone's in-patient program for violating rules, and she never submitted any documentation to DCS regarding her participation in out-patient counseling at Counseling for Change. As of the termination hearing, the Child had been

removed from Mother's care for two years, but Mother had yet to complete any substance abuse program. Furthermore, Mother submitted to relatively few drug screens for DCS, and five out of fourteen were diluted. Despite having filed the petition to terminate Mother's rights, DCS continued to offer services up until the termination hearing and, at one point, attempted a trial home visit. However, Mother could not even maintain sobriety for the thirty-five days that the Child was home, and he had to return to foster care. Although Mother claimed to have been sober for seven months at the termination hearing, with the admitted exception of marijuana use at least once, her refusal to regularly submit to DCS's drug screens made this assertion impossible to verify.

[20]     Ultimately, Mother's history of relapse and refusal to meaningfully engage in substance abuse treatment gives rise to valid concerns that she will continue with her cycle of addiction. It is well established that "[a] pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Given that two years without her Child was not enough to spur Mother into completing treatment, the trial court properly concluded that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement out of the home will not be remedied.

## B. *Best Interests of the Child*

At the end of her appellate brief, for the first time, Mother mentions the Child's best interests. More particularly, she simply asserts that the "lack of evidence" that the Child would be harmed by delaying termination "goes towards the best interests of the child." (Appellant's Br. p. 8). While Mother's lack of a cogent argument regarding this element would warrant a finding that she has waived the issue for appeal, we will address the matter in light of the serious rights at stake. *See* Ind. Appellate Rule 46(A)(8)(a).

The parent-child relationship is undoubtedly "one of the most valued relationships in our culture." *Bester*, 839 N.E.2d at 147 (quoting *Neal v. DeKalb Cnty. Div of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Thus, the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. It is well established that "[p]ermanency is a central consideration in determining the [child's] best interests." *Id.* (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009)).

The trial court determined that termination of Mother's parental rights is in the Child's best interests based, in part, on the recommendation of DCS and the Child's CASA. *See In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) ("[T]he recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests."). The evidence establishes that because of Mother's substance abuse, the Child was removed from her care on two occasions and, as of the termination hearing, had spent nearly half of his life in foster care. Mother's failure to engage in treatment for her addiction renders her unable to provide a safe and permanent life for the Child. In addition, Mother has already demonstrated that the Child has no other caregiver in the event she is arrested again—a risk she takes by continuing to use illegal substances. Accordingly, we agree with the trial court that the evidence establishes that the Child's best interests are served by termination of Mother's parental rights.

# CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the termination of Mother's parental rights.

Affirmed.

Baker, J. and Brown, J. concur